_____

No. 95-1481EA, 95-1482EA
_____


_____          *
                       *
                       *
No. 95-1481EA          *
                       *
_____          *
                       *
                       *
Little Rock School District;    *
                       *
    Plaintiff-Appellee,    *
                       *
Anne Mitchell; Bob Moore; Pat    *
Gee; Pat Rayburn; Mary J. Gage;    *
                       *
    Intervenors-Appellees,    *
                       *
North Little Rock Classroom    *
Teachers Association; Pulaski    *
Association of Classroom    *
Teachers; Little Rock Classroom    *
Teachers Association;    *  On Appeal from the United
                       *  States District Court
    Intervenors,    *  for the Eastern District
                       *  of Arkansas.
Alexa Armstrong; Karlos    *
Armstrong; Ed Bullington;    *
Khayyam Davis; Janice Dent;    *
John Harrison; Alvin Hudson;    *
Tatia Hudson; Milton Jackson;    *
Lorene Joshua; Leslie Joshua;    *
Stacy Joshua; Wayne Joshua;    *
Katherine Knight; Sara    *
Matthews; Becky McKinney;    *
Derrick Miles; Janice Miles;    *
John M. Miles; NAACP; Joyce    *
Person; Brian Taylor; Hilton    *
Taylor; Parsha Taylor; Robert    *
Willingham; Tonya Willingham;    *
                       *
    Intervenors-Appellees,    *
                       *

```
        v.                              *
                                        *

                                        *
Pulaski County Special School           *
District, #1; North Little Rock         *
School District; Leon Barnes;           *
Sheryl Dunn; Mac Faulkner;              *
Richard A. Giddings; Marianne           *
Gosser; Don Hindman; Shirley            *
Lowery; Bob Lyon; George A.             *
McCrary; Bob Moore; Steve               *
Morley; Buddy Raines; David             *
Sain; Bob Stender; Dale Ward;           *
John Ward; Judy Wear;                   *
Grainger Williams;                      *
                                        *
        Defendants-Appellees,           *
                                        *
The Arkansas State Board of             *
Education; State of Arkansas;           *
                                        *
        Defendants-Appellants,          *
                                        *
Office of Desegregation                 *
Monitor,                                *
                                        *
        Claimant.                       *
                                        *
        _____                   *
                                        *
        No. 95-1482EA                    *
        _____                   *
                                        *
                                        *
Little Rock School District;            *
                                        *
        Plaintiff-Appellant,            *
                                        *
Anne Mitchell; Bob Moore; Pat           *
Gee; Pat Rayburn; Mary J. Gage;         *
                                        *
        Intervenors-Appellants,         *
                                        *
North Little Rock Classroom             *
Teachers Association; Pulaski           *
Association of Classroom                *
Teachers; Little Rock Classroom         *
Teachers Association;                   *
                                        *
        Intervenors,                    *
                                        *
Alexa Armstrong; Karlos                 *
```

Armstrong; Ed Bullington;                    *
                                             *
John Harrison; Alvin Hudson;
Tatia Hudson; Milton Jackson;                *
                                             *
Stacy Joshua; Wayne Joshua;
                                             *
        Intervenors-Appellants,
                                             *
Katherine Knight; Sara
Matthews; Becky McKinney;                    *
                                             *
John M. Miles; NAACP; Joyce
Person; Brian Taylor; Hilton                 *
                                             *
Willingham; Tonya Willingham;
                                             *
        Intervenors,
                                             *
        v.
                                             *
                                             *
                                             *
District, #1;
                                             *
        Defendant-Appellee,
                                             *
North Little Rock School
District; Leon Barnes;                       *
                                             *
Richard A. Giddings; Marianne
Gosser; Don Hindman; Shirley                 *
                                             *
McCrary; Bob Moore; Steve
Morley; Buddy Raines; David                  *
                                             *
John Ward; Judy Wear;
Grainger Williams;                           *

        Defendants,                          *

The Arkansas State Board of                  *
                                             *
                                             *
                                             *
                                             *
                                             *
Monitor,
                                             *
        Claimant.

_____

Submitted:  November 16, 1995

Filed:  May 15, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, HEANEY and WOLLMAN, Circuit Judges.
_____


RICHARD S. ARNOLD, Chief Judge.


In this case, we must decide whether certain actions by the State of Arkansas and the Arkansas Department of Education (collectively referred to as the State) run afoul of the Little Rock Schools Desegregation Settlement Agreement.  The plaintiffs, the Little Rock School District (LRSD) and the Pulaski County Special School District (PCSSD), claim that they do, and the District Court agreed.  We affirm in part and reverse in part.


I.


This case is made up of three distinct issues with three separate sets of facts.  The facts themselves are not in serious dispute.  The legal consequences attaching to those facts in light of the Settlement Agreement are.


Before 1994, the State of Arkansas bore the entire burden of funding the workers' compensation programs for all school districts in the State. This approach, quite naturally, did nothing to induce individual school districts to take measures that might reduce workers' compensation exposure.  Therefore, the Arkansas General Assembly changed the law to require individual school districts to provide their own coverage beginning July 1, 1994.  See Ark. Code Ann. §§ 6-17-1411 to 1413 (Repl. 1993).

In order to soften the blow brought about by this change, the State distributed "seed money" to all school districts for the 1994-95 school year. The amount distributed to each school district was based on the number of students in the school district, rather than the number of employees needing coverage. This approach resulted in school districts statewide receiving about one-half of the cost of their coverage, but the plaintiff districts received only about one-third of their coverage costs. Whether the State may cease funding workers' compensation insurance for the plaintiff districts, and, if so, whether the State must distribute to them one-half or one-third of the initial cost in seed money is the first issue that we must address.

The second issue involves "loss funding," and the manner in which the State computes the amount of loss funding due the Pulaski County Districts. Loss funding was created by the General Assembly in 1993, see Ark. Code Ann. § 6-20-302 (Repl. 1993), for the purpose of financially assisting school districts with declining enrollments. The driving force behind the law is the notion that school districts suffering enrollment reductions are never able to reduce staff and cut expenses as quickly as students leave. Of course, when students leave a district, so does the state funding that comes with them. Loss funding helps finance the transition period.

The crux of the problem here is the manner in which the State computes the amount of loss funding due LRSD and PCSSD. Loss funding is normally computed by (and here we simplify) calculating the loss in Average Daily Membership (ADM) in a district as compared to the average ADM of the three previous years, then multiplying that number by a multiplier. However, the State, when figuring loss funding for the Pulaski County Districts, varied the standard formula where majority-to-minority (M-to-M) transfer students are concerned.

M-to-M students are peculiar to the districts that are parties to the Settlement Agreement. They are students who are of the majority race in their home districts, and who voluntarily transfer to another Pulaski County district where they are of the minority race. The State, by way of a funding formula contained in the Settlement Agreement, compensates both the home district and the receiving district for each M-to-M student. The home, or sending, district receives one-half of the state aid that it would have received if the student had remained in the district, while the receiving, or host, district receives the full cost of educating the student.

When the State computes loss funding for sending districts, it treats M-to-M students as if they were still in the district. In other words, it adds M-to-M students who transfer out of the district back into the ADM prior to calculating loss funding. It does so even though these students are no longer being educated by the sending district. This approach results in a reduction in the amount of loss funding paid to the sending district where the M-to-M students transferring out of the district outnumber those transferring in. We must decide whether the Settlement Agreement allows the State to reduce the plaintiff districts' loss funding in this manner.

The third issue arises out of the development of the Arkansas Public School Computer Network (APSCN). This statewide computer network for public schools was mandated by the General Assembly. Acts of 1989, No. 668. Eventually, after consultation with representatives of all state school districts, a plan was developed that utilizes educational cooperatives in each Arkansas county to provide APSCN services. Pulaski County is the only county in the state that does not have an educational cooperative. However, the State did offer to provide APSCN services in some form to the plaintiff districts. (The Pulaski County districts were initially left out of the APSCN plan altogether. The Pulaski County

districts were left out because their representatives at the development meetings had so requested.  That problem is now irrelevant because when the districts complained about the omission, the State amended its plan to include them).

Each school district in the state was given the same three options under the plan.  First, a district could relinquish control over its computer system operations and utilize the APSCN system provided through the local educational cooperative, or Pulaski County's substitute for an educational cooperative, which the State offered to create.  Second, a district could purchase, at its own expense, computer hardware identical to the APSCN hardware, and software would be provided to the district free of charge.  Finally, a district could use either existing or newly acquired hardware that was different from that utilized by APSCN, but no software or financial support would be provided.

Some school districts found all three of these options to be unsatisfactory.  These districts were primarily those that already had substantial investments in computer systems.  Thus, it would be unwise for these districts to scrap their existing systems and utilize the APSCN system.  The plaintiff districts are in this group.

The District Court held that the State's actions in all three of these sets of circumstances ran afoul of the Settlement Agreement.  It ordered the State to fund workers' compensation in the Pulaski County districts to the same extent that funding was provided statewide, approximately one half of the cost of coverage.  It also ordered that the State must exclude those M-to-M students lost to a sending district from ADM for loss-funding purposes.  Finally, it ordered the State to pay over to the Pulaski County districts the amount of funds spent on any other educational cooperative in the state so that the Pulaski County districts can install an APSCN-compatible computer system.

II.

The parties spend some time addressing our standard of review.  In this case we are applying the terms of a contract between the parties to facts that have arisen since its creation.  As with any other case, we review the factual findings of the District Court for clear error.  The meaning of the terms in the Settlement Agreement, and their application to the facts in this case, are legal questions over which we exercise plenary review.

This case is governed by the terms of the Settlement Agreement.  We thus apply the terms of the Settlement Agreement to each of the sets of facts before us.

## A. Workers' Compensation

The Settlement Agreement imposes upon the State an obligation to continue to pay to the settling districts, among other things, "[t]he State's share of any and all programs for which the Districts now receive State funding."  Settlement Agreement § II, paragraph E.  The purpose of this section of the Settlement Agreement is to prevent the State from reducing other State aid in order to recoup the costs it incurred by way of the Settlement Agreement.  Id. § II, paragraph L.  The State is also barred from enacting any legislation that will have a "substantial adverse impact on the ability of the Districts to desegregate."  Ibid.  However, the same paragraph proceeds to read that "[f]air and rational adjustments to the funding formula which have general applicability but which reduce the proportion of State aid shall not be considered to have an adverse impact on the desegregation of the Districts."  Ibid.

Concisely put, the plaintiff districts argue that payment of workers' compensation costs was a "program" for which they received "State funding" when the parties entered into the Settlement

-8-

Agreement. Furthermore, to deprive them of those funds would have a "substantial adverse impact" on their ability to desegregate. The State, conversely, argues that workers' compensation is not a "program" within the contemplation of the Settlement Agreement. Moreover, its decision to cease funding the program was a "fair and rational adjustment" to a funding formula that has "general applicability." Thus, its discontinuation cannot be said to have an adverse impact on desegregation.

In a sense, both arguments are correct. Workers' compensation is a service that school districts must provide. While the State is correct in its assertion that workers' compensation funding is not a direct educational program, it is still an expense that districts must bear. Assuming finite funds, workers' compensation payments will decrease the funds available for more direct educational programs. Moreover, State payments for workers' compensation costs were a source of funds for school districts when the parties entered into the Settlement Agreement. Thus, funding of workers' compensation by the State is a "program" for purposes of the Settlement Agreement.

On the other hand, we do not believe that the State's action regarding the "program" necessarily violates the Settlement Agreement. The program in effect at the time of the Settlement Agreement, as we see it, was equal State funding of workers' compensation for all school districts. Thus, the State can change its funding scheme for workers' compensation, so long as the change is, in the words of the Settlement Agreement, "fair and rational" and of "general applicability."

We see this portion of the Settlement Agreement as an anti-retaliation clause. Its purpose, by its very words, is to prevent the State from cutting other programs in order to pay for its desegregation commitments. If, for example, the State had passed a statute decreasing or eliminating workers' compensation payments

for the settling districts only, while maintaining its system of paying the costs to other school districts, this portion of the Settlement Agreement would clearly have been offended.  The State did not do that, however.  Rather, it changed the funding formula for all districts in the State.  So long as that change affects all districts to the same degree, it does not run afoul of the Settlement Agreement.

That, however, does not end our inquiry.  When the State disbursed "seed money" to help school districts make the transition to paying their own workers' compensation costs, it paid about one-half of the expense statewide.  In the Pulaski County districts, it paid only about one-third of the expense.  This disparity arose because the State's formula used enrollment rather than number of employees to determine how much money each district would receive.  The Pulaski County districts are employee heavy compared to other districts, increasing their workers' compensation costs.  This result is precisely what the anti-retaliation clause was meant to prevent.  It funds the Pulaski County districts to a lesser degree than other districts in the state.  It is of no moment that the State reached this result in a mathematically consistent manner.  The District Court correctly held that the State must disburse seed money to the Pulaski County districts in the same percentage as it does statewide.

B.  Loss Funding

The issue presented by the State's disbursement of loss funding is whether, as to sending or home districts, M-to-M transfer students should be treated as any other student leaving the district.  Loss funding is computed by determining the decrease in average daily membership (ADM) for the year in question as compared to the average of the ADM for the previous three years.  The difference is multiplied by a statutorily determined fraction.  The resulting number is then added to the ADM for the year in

and used to calculate Minimum Foundation Program Aid (MFPA) funds
Clearly, w                                                          y
variable in determining loss funding.


        controversy in this case stems from the State's method fo
determining ADM when it calculates loss funding.  The State does not treat
                    nts as lost to a district for loss-funding purposes.
It                              the ADM prior to figuring loss funding.
In   her words, it pretends that M-to-M transfer students are still in
      sending districts when it determines ADM for the loss-fundin
formula.  The plaintiff districts argue, and the District Court held, that


    We note initially that the State's approach does not comply with the
            statute.  The statute sets forth those "students who may be
   nted in average daily membership."  Ark. Code Ann. § 6-20-301(1)(A)
Majority-to-Minority transfer students are not among them.[1]  Th
violates the statute
ADM.


    The State, however, argues that the
to calculate loss funding in this manner.  The Stipulation for Propose
Order on Voluntary Majority to Minority Transfers (Stipulation), which is

---

[1]

(i)                                                                l
distri   and are enrolled either within a public school
        by the district or in a public school operated by
    her district or a private school for special educatio
students,                                                g
from a written tuition agreement approved by the Department
Education; and

(ii) Legally transferred stude
but attending a public school in the district.

Agreement, reads that M-to-M transfer students "shall not be counted in the number used to calculate regular state aid." Stipulation, paragraph 13(c). Further, the "number used to calculate regular state aid," in the case of loss funding, is the reduction in ADM. The only way not to include M-to-M students in the number used to calculate state aid is to add them back to the ADM as if they were not "lost" to the sending district.

The State bolsters this argument with a more extreme position. It is that, in exchange for the State's picking up the entire expense for M-to-M transfer students, as we have described it, the plaintiff districts agreed to forego all other State aid where those students were concerned. In other words, the quid pro quo for the State's accepting the responsibility for paying approximately 150% of the cost of educating M-to-M transfer students was the plaintiff districts' agreement to bypass other types of state funding that would otherwise be paid for those students.

The State reads the Settlement Agreement and the Proposed Order too narrowly. The funding programs described by the Settlement Agreement are "exclusive of" funds due under other programs. Furthermore, "[t]he State will not exclude the Districts from any compensatory funding programs, early childhood development, or other funding programs or discriminate against them in the development of such programs or distribution of funds under any funding program." Settlement Agreement § II, paragraph F.

We think this language answers the question before us. The State, under the terms of the Settlement Agreement, cannot exclude the Pulaski County districts from "other funding programs" that are created after the Settlement Agreement. Refusing to credit the Pulaski County districts for students who transfer from the districts for any reason, including M-to-M transfer students, does just that. It deprives these districts of the financial benefit

-12-

they would receive under the loss-funding program.

The State would have us believe that the Stipulation contradict reasoning.                                                         d cov      in the Settlement Agreement, while the Stipulation and only the -to-M transfer students.  We disagree.  The theme of the    ttlement Agreement was that the Pulaski County districts would the desegregation payments included in the agreement _____ to other state aid that they would have received.  The language w previously cited expresses that theme, as funds paid by the State under this agreement are not intended to supplant existing or future funding which is ordinarily the responsibility of Id. § II, paragraph E.

tricts of                            funding program available to all other school dis      in the State.  It neither complies with the language of the own statute, nor meets the obligations the State accepted under th Settlement Agreement.  The District Court exclude M-to-M transfer students from ADM in the loss-funding formula.

## C. APSCN

principles we have already discussed resolve the questio presented by the APSCN.  A program was developed and proposed for creating chool district in the state was given the same three op      including the Pulaski County districts.  Several districts, luding these districts, found all three options not to their liking The Pulaski County districts desire, and the State pay them an amount equivalent to what the State would spend for

The District Court's order reaches beyond the terms of the Settlement Agreement. The State is not excluding the Pulaski County districts from the program. It is not offering the program to them in a manner different from any other district. In fact, the State offered to create a whole new cooperative specifically so that the Pulaski County districts would have the same options as other districts. Finally, nothing in the Settlement Agreement requires the State to pay over funds to the districts in lieu of state-wide programs in which they choose not to participate. With respect to APSCN, the order of the District Court is reversed.

III.

The order of the District Court is affirmed with respect to the workers' compensation program and loss funding. We reverse the order with respect to APSCN. The cause is remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.